UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————x
G.W. and D.W., individually and as parents of :
B.W., a minor under the age of 18 years, :
:
                    Plaintiffs, :
:           __OPINION AND ORDER__
       - against - :
:           11 Civ. 8208 (ER)
RYE CITY SCHOOL DISTRICT, :
:
                 Defendant. :
:
————————————————————————x

Appearances:

Peter D. Hoffman, Esq.
Jamie Mattice, Esq.
Law Office of Peter D. Hoffman, P.C.
Katonah, New York
*Attorneys for Plaintiffs, G.W. and D.W., individually and as*
  *parents of B.W., a minor under the age of 18 years*

Ralph DeMarco, Esq.
Keane & Beane, P.C.
White Plains, New York
*Attorney for Defendant, Rye City School District*


      G.W. and D.W. are the parents ("Parents") of B.W.  In 2006, when B.W. was in

kindergarten, he was deemed eligible for special education services as a child with a disability.

Dissatisfied with the educational plan that the Rye City School District (the "Defendant" or the

"District") created for B.W., the Parents removed him from the District's public schools and

enrolled him in private schools.  The Parents then sought reimbursement from the District for the

private school tuition they paid to two schools:  the Windward School in White Plains, New

York, which B.W. attended in the first and second grades (the 2007-08 and 2008-09 school

years); and the Eagle Hill School in Greenwich, Connecticut, which he attended in the third

grade (the 2009-10 school year).  A State Review Officer ultimately ruled against the Parents,

finding that their claim for B.W.'s first grade tuition was time barred, and that they were not

entitled to reimbursement for their son's second and third grade tuition because the District had

duly complied with its obligation by providing him with a free appropriate public education.  The

Parents appealed that decision to this Court under the Individuals with Disabilities Education Act

("IDEA"), 20 U.S.C. § 1415(i)(2).  The parties now cross move for summary judgment.

Docs. 11, 15.  For the reasons set forth below, Plaintiffs' motion for summary judgment is

DENIED and Defendants' motion for summary judgment is GRANTED.

## I.     Statutory Framework

Congress enacted the IDEA to encourage the education of children with disabilities.

*E.A.M. ex rel. E.M. v. N.Y.C. Dep't of Educ.*, 11 Civ. 3730 (LAP), 2012 WL 4571794, at *1

(S.D.N.Y. Sept. 29, 2012) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 179 (1982)).  Under the

statute, any state receiving federal funds must provide a free appropriate public education

("FAPE") to disabled children.  20 U.S.C. § 1412(a)(1)(A); *Rowley*, 458 U.S. at 179.  To satisfy

its obligation, the FAPE provided by the state must include "special education and related

services" tailored to meet the unique needs of the particular child, 20 U.S.C. § 1401(9), and be

"reasonably calculated to enable the child to receive educational benefits."  *Rowley*, 458 U.S. at

207.

A public school ensures that a student with disabilities receives a FAPE by providing the

student with an Individualized Education Plan ("IEP").  *Polera v. Bd. of Educ. of Newburgh*

*Enlarged City Sch. Dist.*, 288 F.3d 478, 482 (2d Cir. 2002).  An IEP is a written statement,

collaboratively developed by the parents, educators, and specialists, that "sets out the child's

present educational performance, establishes annual and short-term objectives for improvements

in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Honing v. Doe*, 484 U.S. 305, 311 (1988), *superseded by statute*, *Joshua A. v. Rocklin Unified Sch. Dist.*, 559 F.3d 1036 (9th Cir. 2009).

Because New York State receives federal funds under the IDEA, it must comply with the requirements of the statute. *Walczak v. Florida Union Free Sch. Dist.,* 142 F.3d 119, 123 (2d Cir. 1998). In New York, the task of developing an IEP rests with local Committees on Special Education ("CSEs"), whose members are appointed by the board of education or trustees of the school district. N.Y. Educ. Law § 4402(1)(b)(1); *Heldman on Behalf of T.H. v. Sobol*, 962 F.2d 148, 152 (2d Cir. 1992). In developing a child's IEP, the CSE must consider four factors: "(1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." *E.A.M. ex rel. E.M.,* 2012 WL 4571794, at *1 (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107-08 (2d Cir. 2007)) (internal quotation marks omitted). The IEP must "be reasonably calculated to enable the child to receive educational benefits," *Gagliardo*, 489 F.3d at 107 (citation and internal quotation marks omitted), "likely to produce progress, not regression," and afford the student with an opportunity greater than mere "trivial advancement." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (quoting *Walczak,* 142 F.3d at 130) (internal quotation marks omitted). However, a school district is not required to provide "every special service necessary to maximize each handicapped child's potential," *Cerra,* 427 F.3d at 195 (citation and internal quotation marks omitted), or "everything that might be thought desirable by loving parents." *Walczak,* 142 F.3d at 132 (citation and internal quotation marks omitted). Furthermore, under an IEP, "education [must] be provided in the 'least restrictive setting consistent with a child's needs'" and the CSE must "be mindful of the IDEA's strong preference for 'mainstreaming,' or

educating children with disabilities 'to the maximum extent appropriate' alongside their non-disabled peers." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 224 (2d Cir. 2012) (citations omitted).

"Parents may challenge the adequacy of their child's IEP in an 'impartial due process hearing' before an [Impartial Hearing Officer ("IHO")] appointed by the local board of education." *E.A.M. ex rel. E.M.,* 2012 WL 4571794, at *2 (quoting *Gagliardo*, 489 F.3d at 109). The IHO's decision may be appealed to a State Review Officer ("SRO"), and the SRO's decision can be challenged in either state or federal court. *Id.* (citation omitted).  When reviewing the SRO's decision, a district court may "receive the records of the administrative proceedings."  20 U.S.C. § 1415(i)(2)(C).  The district court shall then "grant such relief as the court determines is appropriate," based on the preponderance of the evidence. *Id.*  Under the statute, "appropriate" relief may include reimbursement for the cost of a private school placement. *E.A.M. ex rel. E.M.,* 2012 WL 4571794, at *2.

## II.     Factual Background[1]

### a.   B.W.'s Education and Evaluation History

B.W. was born in 2000 and contracted Lyme disease in utero.  D Ex. 9.  In a private neuropsychological evaluation prepared by Cori Scalzo, Ph.D. ("Dr. Scalzo"), dated June 26, 2006, B.W. was diagnosed as having a Mixed Receptive-Expressive Language Disorder,

---

[1] The Court has reviewed the administrative record provided by the parties.  The following facts are drawn from the parties' Local Rule 56.1 Statements, transcripts of the testimony heard by the IHO, exhibits introduced at the IHO hearing, and the decisions of the IHO and SRO.  References prefixed "Tr. _" refer to the transcript of the impartial hearing conducted from November 4, 2009 – January 4, 2011.  "D Ex. _" refers to exhibits submitted by the District for the impartial hearing and "P Ex. _" refers to the Parents' exhibits for the hearing.  References to the "IHO Dec._" are to the May 4, 2011 Impartial Hearing Decision, and references to "SRO Dec._" are to the State Review Officer's Decision dated July 20, 2011.  References to "Def.'s 56.1 ¶_" refers to Defendant's Local Rule 56.1 Statement of Undisputed Material Facts, and to "Pls.' 56.1 Resp. ¶_" refers to Plaintiffs' Response to Defendant's Local Rule 56.1 Statement of Undisputed Material Facts.

Attention-Deficit/Hyperactivity Disorder, Combined Type, Developmental Coordination

Disorder and Disorder of Written Expression.  Def.'s 56.1 ¶ 4.  Dr. Scalzo indicated that, in

terms of cognitive functioning, B.W demonstrated verbal reasoning ability in the average range

and nonverbal, visual perceptual reasoning in the superior range.  *Id.* ¶ 5.  In addition, B.W.'s

abstract reasoning was in the borderline range, his quantitative reasoning was in the average

range and his short-term memory ability was in the low-average range.  Thus, B.W.

demonstrated a significant relative weakness in language-based reasoning/processing ability.

Pls.' 56.1 Resp. ¶ 5.

Dr. Scalzo also found that, while in terms of academic achievement, B. W. was assessed

to have academic skills largely in the average range, these were impacted by his speech,

language, attentional and motor difficulties.  Def.'s 56.1 ¶ 6.  Thus, Dr. Scalzo recommended

that B.W. be provided support in the classroom in order to be successful, both socially and

academically.  Specifically, Dr. Scalzo found that because of B.W.'s disability, he would need a

systematic, intensive, multi-sensory, phonics based approach to teaching (e.g., Orton-

Gillingham). [2]  In addition to a multi-sensory approach for use in school, Dr. Scalzo

recommended that B.W. receive weekly private tutoring in reading and written expression,

including a multi-sensory handwriting program.  Pls.' 56.1 Resp. ¶ 6.

In March 2006, in preparation for B.W.'s entrance to kindergarten, D.W., the student's

mother, obtained a physical examination form from B.W.'s pediatrician, Steven Cowan, M.D.

("Dr. Cowan").  IHO Dec. 50.  In the form he prepared, Dr. Cowan noted that B.W. suffered

from "Chronic Lyme – PDD," which stands for Pervasive Developmental Disorder.  D Ex. 18.

---

[2] Orton-Gillingham is a "specialized, multisensory teaching method designed to educate students with dyslexia and other learning disabilities."  *Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 384 n.12 (S.D.N.Y. 2006).

D.W. testified that she provided the form to Dr. Finkelson, the school psychologist, as part of the registration process.  IHO Dec. 50.  At the impartial hearing, D.W. testified that Dr. Finkelson urged her to suppress the PDD diagnosis, suggesting that a classification of autism might be harmful and premature, while   assuring her that B.W.'s needs would be met regardless of his classification.  *Id.*  D.W. testified that she did not mention the PDD diagnosis again.  *Id*.

B.W. attended kindergarten in the District at Osborn Elementary School ("Osborn") during the 2006-07 school year.  Def.'s 56.1 ¶ 7.  Prior to the start the school year, in September 2006, the District's 504 Committee ("504 Committee") developed a 504 Accommodation Plan ("504 Plan") for B.W. as a kindergarten student at Osborn for the 2006-07 school year.  *Id*. ¶ 8.  In the 504 Plan, the 504 Committee recommended, among other things, that B.W. receive group occupational therapy ("OT"), OT consultation, psychological consultation, speech/language ("S/L") consultation, individual S/L therapy and group S/L therapy.  *Id*. ¶ 9.  At that time, the 504 Committee also referred B.W. for evaluation by the District's Committee on Special Education ("CSE").  *Id*. ¶ 10.

After the start of school in September 2006, the CSE conducted evaluations of B.W.  *Id*. ¶ 12.  An initial review meeting was held on November 28, 2006, at which the CSE classified B.W. as having a speech or language impairment ("SLI") and developed an Individualized Education Program ("IEP") for B. W. as a kindergarten student at Osborn for the remainder of the 2006-07 school year.  *Id*. ¶ 9.  In the 2006-07 IEP, the CSE recommended, among other things, that B.W. receive a shared "shadow" aide, group OT, OT consultation, psychological consultation, S/L consultation, individual S/L therapy and group S/L therapy.  *Id*. ¶ 14.  The 2006-07 IEP indicated that it was based upon, among other things, evaluations conducted by the CSE, the private evaluation prepared by Dr. Scalzo, an additional private evaluation prepared by

Gail Gallante, MS, CCC-SLP, in April and May 2006, and anecdotal reports of those in attendance at the meeting. *Id*. ¶ 16.  The Parents declined OT services for B.W.  *Id*. ¶ 17.

During the 2006-07 school year, the Parents sent applications for B.W. to the Windward School, located in White Plains, New York ("Windward") and Eagle Hill School, located in Greenwich, Connecticut ("Eagle Hill").  *Id*. ¶ 18.  On B.W.'s application to Windward, dated October 2, 2006, his mother, D.W., wrote that "B. is friends with all his classmates and has two best friends he spends extra time with outside of school."  D Ex. 57; Tr. 3840-41.  Similarly, on B.W.'s application to Eagle Hill, completed in or around late 2006 or early 2007, D.W. indicated that B.W. "enjoys his classmates and they are interested in what [B.W.] says and does."  D Ex. 71; Tr. 5429, 5431.  D.W. noted no social issues for B.W., except that "he seeks out other children but can be stubborn and bossy at times."  D Ex. 71.  However, in her testimony during the IHO hearing, B.W.'s mother testified that, during this period of time, he was being bullied in school and did not have friends.  Tr. 3470; Pls.' 56.1 Resp. ¶ 21.

According to his kindergarten teacher, Michele Garrison, B.W. made significant progress at Osborn during the 2006-07 school year, Tr. 5711, 5728, though he sometimes became frustrated with new tasks and information.  Def.'s 56.1 ¶ 20; Tr. 3444.  In her report on B.W.'s progress, Ms. Garrison rated him as "secure" in fifty of the fifty-two skills outlined in the report and between "developing" and "secure" for the remaining two skills.   Pls.' 56.1 Resp. ¶ 21; D Ex. 39.  In the comments section of the Progress Report, Ms. Garrison specifically wrote, "This has been a year of tremendous growth for [B.W.]-socially, emotionally, and academically."  *Id*. Ms. Garrison went on to explain that he had made friends, he was able to write words by sounding out, he was using sight words when reading and writing, his journal reflected creative ideas, his math skills had steadily improved, he understood all concepts that have been taught

and he was able to translate addition and subtraction problems into a math sentence.  *Id*.
Likewise, in comments on his pupil record folder, Ms. Garrison specifically wrote that B.W.
"made much progress through the year!"  D Ex. 72.  Ms. Garrison then explained that B.W. was
able to work with numbers solving addition and subtraction problems, could read using good
phonemic skills, had modulated his temper and voice and was a good listener.  *Id*.  The Parents
disagreed in part with this otherwise favorable report, noting that B.W. was having difficulty
with his math and reading readiness skills.  Pls.' 56.1 Resp. ¶ 21; Tr. 5829.

 Moreover, in his 2006-07 Speech/Language End of Year Report, his District S/L
Pathologist, Amy Silver, indicated that B.W. showed good progress, specifically in his receptive
and expressive language skills, his comprehending information presented verbally by answering
"wh" questions, listening, retaining, repeating and following two-step commands, retelling
verbally presented narratives, past tense verb forms of irregular verbs, creating grammatically
correct sentences and social language skills.  Def.'s 56.1 ¶ 22; D Ex. 44.  While the Parents
agreed that B.W. was making progress, they believed that his progress in speech and language
was not being transferred into the classroom.  Pls.' 56.1 Resp. ¶ 22.

 In his kindergarten language arts portfolio, B.W. demonstrated an increase in his phonetic
awareness, proficiency in letter/sound recognition for capital and lower case letters, show and
tell, initial sounds and final sounds, and his early emergent word list.  Def.'s 56.1 ¶ 23; D Ex. 73.

**b.  The 2007-08 IEP**

 At an annual review meeting on May 2, 2007, the CSE continued to classify B.W. as
having an SLI and developed an IEP for B.W. for his first grade year, the 2007-08 school year.
Def.'s 56.1 ¶ 24.  There is no dispute that the CSE had all requisite members in attendance at its
May 2, 2007 meeting.  *Id*. ¶¶ 25-26.  The 2007-08 IEP indicated that it was based upon, among

other things, previously considered evaluations conducted by the CSE within the last three (3) years, previously considered private evaluations submitted by the Parents, a District speech/language progress summary and anecdotal reports of those in attendance at the meeting. *Id*. ¶ 26.  The IEP also indicated that it was based upon the physical examination form prepared by Dr. Cowan dated March 29, 2006, which contains the PDD diagnosis.  D Ex. 18.  Ms. S. Klein, Chair of the CSE, and D.W. testified that they could not recall whether that report was specifically discussed at the CSE meeting. [3]  Pls.' 56.1 Resp. ¶ 26; Tr. 324, 3473.

While the CSE noted in the final IEP that D.W. "reported that kindergarten has been an excellent year for [B.W.] and that the combination of the teacher and aide has been a positive for him this school year," D.W. denies stating at the May 2007 CSE meeting that kindergarten had been an "excellent year" for B.W.  Pls.' 56.1 Resp. ¶ 2; D Ex. 1.

The IEP recommended that B.W. be placed as a first grade student in a regular education class at Osborn with a special education program consisting of a consultant teacher model class, known as a resource consultant teacher class, for three (3) periods per week for thirty (30) minutes per period with related services consisting of a shared "shadow" aide for six (6) hours per day, group OT for two (2) periods per week for thirty (30) minutes per period, individual S/L therapy for one (1) period per week for thirty (30) minutes per period and group S/L therapy for one (1) period per week for thirty (30) minutes per period.  Def.'s 56.1 ¶ 28.

The CSE added resource consultant teacher support and continued aide support for B.W. due to the increased demands of first grade.  *Id*. ¶ 29.  Moreover, the CSE recommended that B.W. receive program modifications consisting of refocusing and redirection, use of visual aids

---

[3] As discussed further below, the Parents allege that the District was made aware of the diagnosis and ignored it in preparing the IEPs for B.W.

to support auditory information, support during transitions in the classroom and throughout the school building, directions repeated and explained, checks for understanding, short breaks and preferential seating.  *Id.* ¶ 30.  In addition, the CSE recommended that school personnel receive support on behalf of B.W. with a psychological consult for one (1) period per month for thirty (30) minutes per period.  *Id.* ¶ 31.

Dissatisfied with the IEP, the Parents unilaterally placed B.W. at Windward as a first grade student during the 2007-08 school year.  *Id.* ¶ 33.  Specifically, they allege that they were "forced" to enroll B.W. in Windward so that he could receive an appropriate education. According to the Parents, Windward's immersive program, including an approach using the multi-sensory Orton-Gillingham program, and B.W.'s participation in the Preventing Academic Failure (PAF) program, with a reading and language-based curriculum for every subject, better suited B.W.'s "specific and unique needs under a totality of the circumstances."  Pls.' 56.1 Resp. ¶ 33.

### c.  <u>The 2008-2009 IEP</u>

At an annual review meeting on June 19, 2008, the CSE continued to classify B.W. as having an SLI and developed an IEP for B.W.'s second grade year, the 2008-09 school year. Def.'s 56.1 ¶ 35.  The Parents contest that the CSE was comprised of all the required members. In particular they allege that the regular education teacher, Mrs. L. Napoleon, did not actively participate because she was "distracted" and left before the end of the meeting, and that it was unclear whether Mrs. Napoleon, a first grade teacher, would be the regular teacher that would be responsible for implementing the curriculum set out in the proposed 2008-2009 IEP.  Pls.' 56.1 Resp. ¶ 36.  Furthermore, the Parents assert that the Windward personnel were not members of the CSE team because they only participated by phone.  *Id.*  Thus, they argue, no "appropriate"

special education teacher was present, despite the fact that the District was represented by Ms. C. Ranalli, a special education teacher.[4]  *Id.*

The 2008-09 IEP indicated that it was based upon, among other things, previously considered evaluations conducted by the CSE within the last three years, previously considered private evaluations submitted by the Parents, including Dr. Cowan's physical examination report,[5] Windward test results and reports, a classroom observation report prepared by a member of the District, and anecdotal reports of those in attendance at the meeting.  Def.'s 56.1 ¶ 37.

The CSE developed an IEP that recommended that B.W. be placed as a second grade student in a regular education class at Osborn with a special education program consisting of a consultant teacher model class, known as a resource consultant teacher class, for five (5) periods per week for forty-five (45) minutes per period with related services consisting of a shared "shadow" aide for six (6) hours per day, counseling consultation for one (1) period per month for thirty (30) minutes per period, individual counseling for one (1) period per week for thirty (30) minutes per period, group OT for two (2) periods per week for thirty (30) minutes per period, S/L consultation for one (1) period per month for thirty (30) minutes per period, individual S/L therapy for one (1) period per week for thirty (30) minutes per period and group S/L therapy for one (1) period per week for thirty (30) minutes per period.  Def.'s 56.1 ¶ 40.  The CSE also recommended that B.W. receive extended school year services consisting of a resource room class for three (3) periods per week for one (1) hour per period.  *Id.* ¶ 41.  The CSE added

---

[4] The Parents acknowledge that Ms. Ranalli would have taught B.W. in the second grade had he attended Osborn. Pls.' 56.1 Resp. ¶ 41.

[5] D.W. did not recall Dr. Cowan's physical examination report (D Ex. 18) being discussed at this meeting either. Pls.' 56.1 Resp. ¶ 37.  However, Ms. Klein, the CSE chair, testified, the "based upon" section does not necessarily reflect material that is presented to the CSE during the actual meeting.  Rather, it cumulatively reflects material which may have been presented at earlier meetings.  IHO Dec. 12 n.8.

additional resource consultant teacher support and extended school year services for B.W. due to input from the Parents and representatives from Windward. *Id.* ¶ 42. Moreover, the CSE recommended that B.W. continue receiving the same program modifications from the 2007-08 IEP, and added support during transitions in the classroom and throughout the school building, especially during unstructured activities, directions repeated (directions repeated and rephrased, explained), additional time to process information, preferential seating (near the teacher), additional time to complete written assignments, break-down of tasks into smaller segments, sensory breaks, and preview of new information prior to instruction. *Id.* ¶ 43. In addition, the CSE recommended that B.W. receive testing accommodations consisting of flexible setting, directions read, directions repeated and rephrased, checks for understanding and answers recorded. *Id.* ¶ 45.

During the June 2008 CSE meeting, the Parents informed the District that B.W. would return to Windward for the 2008-2009 school year because the District did not offer B.W. an integrated, multi-sensory program. Pls.' 56.1 Resp. ¶ 39. The Parents challenge the adequacy of the 2008-09 IEP. They allege that the IEP's goals were not tailored to meet B.W.'s deficits, and were not appropriate for B.W. because they were for a regular education program, and therefore did not fit his needs as a special education student. *Id.* ¶ 45. In addition, the Parents allege that the District had predetermined the IEP prior to the CSE meeting, without their input or that of Windward personnel, who were given no prior notice of the proposed goals. *Id.* The Parents specifically allege that Dr. Finkelson ignored Dr. Cowan's diagnosis of PDD and kept this information from the CSE. *Id.*

### d.  **The 2009-10 IEP**

By letter, dated February 26, 2009, the Parents were notified that B.W. was accepted by Eagle Hill for the 2009-10 school year.[6]  Def.'s 56.1 ¶ 47.  Around this time period, the District had sent a letter to the Parents seeking their consent to conduct a triennial reevaluation of B.W. *Id.* ¶ 48.  Unbeknownst to the District, however, the Parents were in the process of obtaining multiple private evaluations of B.W.  *Id.* ¶ 49.

The CSE held a meeting on April 28, 2009, to develop an IEP for B.W.'s third grade year, the 2009-10 school year.  *Id.* ¶ 52.  The CSE continued to classify B.W. as having an SLI. *Id.* ¶ 52.  The 2009-10 IEP indicated that it was based upon, among other things, previously considered evaluations conducted by the CSE within the last three (3) years, previously considered private evaluations submitted by the Parents, including Dr. Cowan's physical examination report,[7] private school reports and anecdotal reports of those in attendance at the meeting.  Def.'s 56.1 ¶ 54.  Laura Finkelson, the District's school psychologist, had sought to do an updated classroom observation of B.W. at Windward, but was delayed while the visit was coordinated by D.W., who would not allow the observation to take place without another one of the Parents' private provider witnesses, Carol Fiorile, Ph.D., in attendance.  *Id.*

---

[6] The Parents deny that they had made a firm decision to place B.W. in Eagle Hill for the 2009-10 school year.  Pls.' 56.1 Resp.  However, according to Dr. Moskowitz, one of the Parent's private providers, as part of her private evaluation of B.W. in April 2009, she had an intake meeting several weeks before April 16, 2009 during which the Parents told her that they had definitively made the decision to send B.W. to Eagle Hill for the upcoming year.  Tr. 4285-86.  Similarly, according to another one of the Parents' private provider witnesses, Gail Gallante, D.W. told her prior to April 6, 2009, that the Parents intended to enroll B.W. in Eagle Hill for the upcoming year.  Tr. 4081.  Ms. Gallante specifically documented this intention in the text of her private evaluation.  Def.'s 56.1 ¶ 51.

[7] Again, Dr. Cowan's diagnosis that B.W. suffered from PDD is listed in the IEP, it was not discussed at the meeting.  Pls.' 56.1 Resp. ¶ 54.

The CSE developed an IEP that recommended that B.W. be placed as a third grade student in a regular education class at Osborn with a special education program consisting of a consultant teacher model class, known as a resource consultant teacher class, for five (5) periods per week for forty-five (45) minutes per period with related services consisting of a shared "shadow" aide for six (6) hours per day, counseling consultation for one (1) period per month for thirty (30) minutes per period, group counseling for one (1) period per week for thirty (30) minutes per period, group OT for two (2) periods per week for thirty (30) minutes per period, S/L consultation for one (1) period per month for thirty (30) minutes per period, individual S/L therapy for one (1) period per week for thirty (30) minutes per period and group S/L therapy for one (I) period per week for thirty (30) minutes per period.  *Id.* ¶ 58.  The CSE also recommended that B.W. receive extended school year services consisting of a resource room class for three (3) periods per week for one (1) hour per period.  *Id.* ¶ 59.

Moreover, the CSE recommended that B.W. receive program modifications consisting of refocusing and redirection, use of visual aids (e.g., manipulatives/graph paper) to support auditorally presented information, support during transitions (e.g., verbal prompts, visual schedules), directions repeated (directions repeated and rephrased, explained), checks for understanding, additional time to process information, preferential seating (near the teacher), additional time to complete written assignments, break-down of tasks into smaller segments, sensory breaks, and preview of new information prior to instruction (pre-teaching/re-teaching). *Id.* ¶ 60.  In addition, the CSE recommended that B.W. receive testing accommodations consisting of flexible setting, directions read, repeated and rephrased, checks for understanding and answers recorded.  *Id.* ¶ 61.

Dr. Finkelson, the District school psychologist subsequently conducted a classroom observation of B.W. at Windward on June 11, 2009, with Dr. Fiorile also in attendance. *See* ¶ 54 *supra*; D Ex. 37; Tr. 1815. At the outset of the observation, a Windward staff member told Dr. Finkelson that it had been an uncharacteristically difficult day for B.W. and suggested that B.W. might not have been medicated that day. *Id*. 1815-18. As a result, Dr. Finkelson was unable to draw any conclusions about B.W. from her observation. *Id*. 816. Because the observation took place so late in the school year, Dr. Finkelson was unable to schedule a second classroom observation of B.W. at Windward. *Id*. 1222-23.

At the time of the CSE meeting on April 28, 2009, B.W. had been evaluated by two providers. However, the Parents did not inform the District that they had retained private providers to evaluate B.W. during the April CSE meeting. The Plaintiffs provided these private evaluations to the District in July 2009. Pls.' 56.1 Resp. ¶ 64. After receiving the private evaluations, the District scheduled a CSE meeting for September 8, 2009, but that meeting had to be canceled because the Parents claimed that they were not available on that date. Def.'s 56.1 ¶ 65. The Parents then unilaterally placed B.W. at Eagle Hill for his third grade year (2009-10 school year). *Id*. ¶ 66.

The Parents challenge the composition of the CSE because none of the District teachers present at the meeting had ever met, taught or observed B.W., and the Windward faculty who knew B.W. were only present by phone. Pls.' 56.1 Resp. ¶ 53. In addition, they allege that aside from the Study Skills Goals added to the 2009-10 IEP, the remaining goals were non-specific and did not relate to B.W.'s needs and disabilities. *Id*. ¶ 54.

### e.   **The District E-mail System**

Prior to August 2009, the District purged 180 day old e-mails in the normal course of business.  *Id.* ¶ 67.  This practice changed in August 2009 when the District converted to a new archive system which allowed for e-mails to be retained for up to seven years.  *Id.*  However, as a result of the prior practice, the District only had e-mails archived 180 days back to January 2009, and not prior.  *Id.*  The purging of e-mails after 180 days was a District-wide policy that affected all schools, all staff members and all students.  *Id.*

### f.   **The Impartial Hearing and IHO Decision**

The Parents commenced an Impartial Hearing against the District by filing an Impartial Hearing Demand ("Demand") dated July 31, 2009.  Among other things, the Parents sought tuition reimbursement from the District for the unilateral placement of B.W. at Windward for the 2007-08 and 2008-09 school years, and at Eagle Hill for the 2009-10 school year.  In an Answer dated August 14, 2009, the District objected to the claims made and relief sought by the Parents. After a hearing that spanned 30 days over 14 months, the IHO issued a 94-page Findings of Fact and Decision on May 4, 2011.

In her decision, the IHO ruled partially in favor of the District and partially in favor of the Parents.  IHO Dec. 89. The IHO principally found that the District had failed to provide B.W. with a FAPE for the 2008-09 and 2009-10 school years and awarded the Parents a total of $19,000.00.  Of that amount, $12,500.00 was for a portion of the costs for Windward during the 2008-09 school year, and $6,500.00 was for a portion of the costs for Eagle Hill during the 2009-10 school year.  *Id.*  In so doing, the IHO indicated that the tuition reimbursement amounts that she awarded to the Parents were "reduced considerably" based on equitable considerations.  *Id.*

16

The IHO dismissed the Parents' tuition reimbursement claim for Windward for the 2007-08 school year as time-barred by the applicable statute of limitations. *Id*. 66-68. In addition, the IHO declined to address the Parents' claims that were not included in their underlying Demand, such as their claims related to the Physical Examination Form from Dr. Cowan dated March 29, 2006 ("Cowan Form"), the alleged inappropriateness of services generated by either the Committee on Preschool Special Education ("CPSE") or 504 Committees, the alleged termination of related services following the March 7, 2005 CPSE review meeting, and the alleged intentional manufacture of CPSE meetings that they claimed not to have been held by the District. *Id*. 64-66. Moreover, the IHO determined that the Parents were not entitled to reimbursement for costs of their private evaluations, *id*. 84-85, and had not met their burden of proving spoliation of evidence by the District. *Id*. 63-64.

In her assessment of the equitable considerations, the IHO made several critical credibility findings against the Parents, noting, among other things, that they had stone-walled, concealed information, failed to share multiple outside evaluations with the District, and showed only a "marginal interest" in working collaboratively with the District." *Id*. 81, 86-87. The IHO found that neither parent was entirely forthcoming in terms of their descriptions of the child's behavior. *Id*. 69. For example, she described the April 28, 2009 CSE as "little more than a well-orchestrated charade in which the District's attempts to develop meaningful educational planning were met with studied omissions and exclusions." *Id*. 79. In particular, the IHO noted that

> Even as the District was attempting to develop an IEP for the following year on April 28, 2009, the Parents were furtively gathering educational, psychological and speech assessments which were concealed from the District. In fact, Dr. Moskowitz's last date of evaluation occurred on the same day as the CSE convened. Describing a child with 'blatant' social ineptness, 'bizarre' responses to projective testing and 'lapses in reality testing,' Dr. Moskowitz testified that she was apprised by April 2009 that B.W. would be transferring to Eagle Hill. None

of this information was shared until July 30, 2009.  Other assessments were
disclosed long after the commencement of due process proceedings.

*Id*. 80 (citations omitted).  The IHO found that it was "clear that the District was intentionally

excluded from this information, underscoring the Parents' marginal interest, if any, in working

collaboratively with the District."  *Id*. 87.

      The IHO also found "suspicious" the parents failure to apprise the District of the fact that

B.W. had been experiencing a deterioration of his functional abilities during his two years at

Windward.  *Id*. 81.

      As the IHO concluded, "It is clear that the Parents have largely excluded the District from

the decision making process with regard to the education of their son.  Regrettably, this is a

considerable breach of their duty to work collaboratively with the School District."  *Id*. 86.

### g.  The Impartial Hearing Appeal and SRO Decision

      Both the District and the Parents separately appealed from the IHO's Decision for review

by the SRO.  Def.'s 56.1 ¶ 74.  In a Decision, dated July 20, 2011 ("SRO's Decision"), the SRO

ruled in favor of the District and annulled the portions of the IHO's Decision which determined

that the District had failed to offer B.W. a FAPE for the 2008-09 and 2009-10 school years and

ordered the District to pay a limited portion the tuition costs at Windward and Eagle Hill.  *Id*. ¶

76.  In so ruling, the SRO held that, "[t]he [H]earing [R]ecord as a whole reflects that the June

2008 IEP and the April 2009 IEP, *based on the information available to the CSE at the time they*

*were developed* . . . offered the student special education programs and related services that were

reasonably calculated to enable the student to receive educational benefits."  SRO Dec. 29

(emphasis added).  The SRO found that the recommendations contained in the IEPs were

formulated and adjusted in accordance with B.W's special education and related services needs,

"frequently due to input from Windward personnel regarding the student's performance." *Id*. 28-29.  As a result, the SRO wrote that it was not necessary to address the appropriateness of the Parents' unilateral private placements for the years in question or whether equitable considerations supported the Parents' claims for reimbursement. *Id*. 30.  The SRO also held that the IHO properly declined to address the Parents' claims that were not included in their underlying Impartial Hearing Demand, such as their claims related to the diagnosis of PDD referenced in the Cowan Form. *Id*. 8.  In addition, the SRO upheld the IHO's determination that the Parents' claims for the 2007-08 school year were time-barred, including their claim for reimbursement of tuition costs for the 2007-08 school year. *Id*. 9.  Furthermore, the SRO, like the IHO, found that the District's practice of purging e-mails did not rise to the level of spoliation of evidence. *Id*. 12.

i. *The 2008-09 IEP*

The SRO found that the June 2008 IEP properly reflected B.W.'s present levels of academic achievement, social development, and management needs based on the evaluative information that was available to the June 2008 CSE.  Of particular note, in response to the Parents' allegation that the June 2008 CSE meeting did not have current knowledge of the student, the SRO found that the "hearing record reflect[ed] that the student attended Windward during the 2007-08 school year, and the Windward CSE liaison, as well as the student's Windward science teacher, actively participated during the June 2008 CSE meeting by providing specific, current information regarding the student[']s needs and skills." *Id*. 15 (citation omitted).  Indeed, the SRO found that the resulting IEP was directly informed by the input of the Windward personnel present at the CSE.

For example, the 2008-09 IEP recommended that B.W. receive a general education program with daily 45-minute sessions of 15:1 resource consultant teacher services in a separate location, and the services of a full-time shared aide.  *Id.* 20; D Ex. 2 p.1.  This represented an increase of the amount of weekly resource consultant teacher services previously offered in the 2007-08 school year, "based in part upon input from the Windward liaison who agreed that the student should receive daily special education instruction."  SRO Dec. 20.  The Windward CSE liaison stated on the record that the District's description of and recommendation for the resource consultant teacher services at the June 2008 CSE meeting "sounds good."  *Id.*; P Ex. E-1 pp. 47-48.

Similarly, the District speech-language pathologist testified that the description of the student's needs as reflected in the category "present levels of performance" of the proposed IEP was accurate, and recommended that in addition to one individual and one group session of speech-language therapy per week, B.W. be offered one speech-language consultation per month.  SRO Dec. 22.  The District pathologist reviewed proposed speech-language goals with the Windward CSE liaison during the June 2008 CSE meeting, *id.*, who approved of the proposed annual goals, which were then incorporated into the June 2008 IEP.  *Id.*

To address the student's visual motor integration weaknesses, graphomotor deficits and sensory processing difficulties, the June 2008 CSE recommended that he receive two group sessions of OT per week.  *Id.*; D Ex. 2 p. 2.  The record reflects that the District occupational therapist reviewed proposed annual OT goals with the Windward CSE liaison at the June 2008 CSE meeting, who offered comments regarding the student's skills and her approval of the goals.  SRO Dec. 22; P Ex. E-1 p. 31-36.

Finally, the SRO noted that it was the Windward CSE liaison who stated during the meeting that the student would benefit from receiving extended school year (ESY) services because otherwise he would regress over the summer.  SRO Dec. 22.  The liaison specifically suggested that B.W. would benefit from repetition and reinforcement throughout the summer at least three times a week so that he would retain all of the skills that he had learned.  *Id*.  "In response to Windward's concerns, the June 2008 CSE offered the student three 60-minute sessions of resource room as ESY services, to address his reading/decoding skills."  *Id*.

Generally, the SRO found that the June 2008 IEP contained annual goals related to the student's identified needs in the areas of reading decoding and fluency, spelling, written expression, mathematics, auditory comprehension, expressive language, pragmatic language and social skills, and fine motor and graphomotor skills.  *Id*. 20.  He further found that B.W. was offered appropriately designed program modifications to meet his special education needs.  In combination with the resource consultant teacher services to address the student's academic needs, and the shared aide services, the June 2008 CSE recommended that the student receive numerous program modifications to provide support due to his attention and language difficulties.  *Id*. 21.  The CSE liaison expressed her agreement with the modifications at the June 2008 meeting.  *Id*.  Indeed, "[s]ome of the program modifications offered, including the use of visual aid[]s, and verbal repetition of information, had been successfully implemented with the student during the 2007-08 school year at Windward."  *Id*.

Based on B.W.'s program at Windward, and due to his occasional need to be removed from his Windward classroom due to his behavior, the June 2008 CSE recommended that he receive one monthly counseling consultation session, and one individual 30-minute counseling session per week.  *Id*. 21-22.  "The school psychologist testified that if a student did not respond

to the building level behavior plan, a 'more formal' behavioral assessment could be conducted."

*Id*. 22.

The SRO also considered, and specifically rejected the Parents' argument that the CSE

was improperly constituted because the regular education teacher left the meeting early:

> A transcript of the June 2008 CSE meeting, submitted by the parents, reflected that the regular education teacher participated during the meeting in a discussion of the student's goals, and toward the end of the meeting when she asked if she was still needed, the director [of special education] and the [D]istrict's attorney stated that she was. The transcript does not reflect that the regular education teacher left prior to the conclusion of the June 2008 CSE meeting. I am not persuaded that both parents and their counsel would have let pass unmentioned the regular education teacher leaving prior to the conclusion of the meeting after objecting to releasing her from attendance, and even if I were to find that the regular education teacher did not attend the entirety of the June 2008 CSE meeting, the hearing record nevertheless supports the impartial hearing officer's determination on this issue, and does not reflect that such a procedural inadequacy as partial attendance (a) impeded the student's right to a [FAPE]; (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a [FAPE] to the student; or (c) caused a deprivation of educational benefits.

*Id*. 15 (internal citations omitted).

In sum, the SRO concluded that the annual goals, program modifications, and special

education and related services provided for in the June 2008 IEP were adequately designed to

address B.W.'s unique needs and the IEP was therefore reasonably calculated to enable B.W. to

receive educational benefits.  *Id*. 22-23.

ii.  *The 2009-10 IEP*

The SRO found that the April 2009 IEP also properly reflected B.W.'s present levels of

academic achievement, social development, physical development, and management needs based

on the evaluative information that was available to the CSE.  The District personnel who testified

opined that "the levels of performance contained within the April 2009 IEP were accurate

summaries of what they understood the student's skills and needs to be at the time the IEP was

formulated." *Id.* 26.  As with the formulation of the prior year's IEP, the Windward science

teacher participated in the development of the "2009-10 annual goals related to the student's

needs in the areas of attention, classroom transitions, reading decoding and fluency, spelling,

written expression, mathematics, auditory comprehension, expressive and receptive language,

pragmatic language and social skills, visual motor and graphomotor skills, and sensory

processing abilities." *Id.*  Importantly, the SRO noted that the IHO had "determined that, based

upon the district's knowledge of the student's needs at the time of the April 2009 CSE meeting,

the annual goals were appropriate, and the parent has not appealed from that decision." *Id.*

The resource consultant teacher services recommended for the 2009-10 school year were

similar to those recommended by the CSE for the 2008-09 school year. *Id.*  Ms. Bobson, the

special education teacher who attended the April 2009 CSE meeting, and who would have

become the student's 2009-10 resource consultant teacher had he attended Osborn, testified that

the daily resource consultant teacher services set forth in the IEP were appropriate and "had been

developed based upon the April 2009 Windward progress report and information provided by

Windward personnel." *Id.*

The April 2009 IEP continued to offer program modifications similar to those offered in

the June 2008 IEP.  In addition, based upon information that "appear[ed]" to stem from

Windward personnel, modifications specific to the April 2009 IEP included providing examples

of using manipulatives and graph paper, and providing pre-teaching and re-teaching

opportunities. *Id.* 27.  "Both the speech-language pathologist and the special education teacher

who attended the April 2009 CSE meeting testified that, based upon the information before them,

they agreed with the program modifications recommended for the student, which had been developed with the participation of the student's Windward science teacher."  *Id*.

The proposed IEP provided for one weekly group counseling session and one monthly consult session designed to address the student's social needs.  *Id*. 28.  "The school psychologist testified that the CSE changed the student's recommended weekly counseling service from individual to group based upon information from Windward that highlighted the student's difficulty cooperating with peers and developing social skills."  *Id*.

The District speech-language pathologist reviewed the proposed speech-language annual goals with Windward personnel during the April 2009 CSE meeting.  *Id*.  "Regarding the student's OT needs, the April 2009 IEP indicated that '[a]ccording to Windward, [the student], continue[d] to have difficulties with visual motor, sensory motor and graphomotor skills which affect his daily performance in the classroom and at home.'"  *Id*.  Accordingly, the CSE recommended two weekly sessions of OT to address these deficits.  *Id*.

Is sum, the SRO concluded that "the hearing record reflects that the [D]istrict responded to the information available at the time the IEP was formulated and adjusted the student's special education and related service recommendations accordingly, frequently due to input from Windward personnel regarding the student's performance."  *Id*. 28-29.  Since the SRO determined that the 2008-09 and 2009-10 IEPs were appropriate, he did not find it necessary to make a determination as to the whether the unilateral placement of B.W. at Windward and Eagle Hill was appropriate, or whether equitable considerations supported the Parents' claims for reimbursement.[8]  SRO Dec. 30.

---

[8] However, while noting that it was not relevant to his determination that the District offered B.W. a FAPE, the SRO noted that the Parents failed to inform the District that they were in the process of obtaining a series of private evaluations of B.W. at the time of the April 2009 CSE meeting, and did not provide private evaluation reports until

iii.  *Matters Not Addressed by the IHO*

The SRO held that the IHO had properly declined to address the Parents' claims that were not included in their underlying Impartial Hearing Demand, such as their claims related to the Cowan Form—which contained the notation that B.W. suffered from PDD—and that the IHO had properly held that the Parents' claims for the 2007-08 school year were time-barred. Def.'s 56.1 ¶ 83.  The SRO found that, "upon review of the hearing record, the alleged failure of the [D]istrict to address the student's needs as they relate to a purported diagnosis of PDD is not reasonably referenced in the parents' 25-page due process complaint notice as a part of the nature of the problem so as to reasonably put the [D]istrict on notice that it would be expected to defend against this singular notation and any and all claims related thereto[.]"  SRO Dec. 8. Importantly, the SRO noted that even if the Parents had properly raised the issue that the District ignored a diagnosis of PDD, it was of no moment because the relevant inquiry was whether the IEP was tailored to the student's specific needs, regardless of the child's diagnosis.  *Id.* 8 n.7 (citing *Fort Osage R-1 Sch. Dist. V. Sims*, 641 F.3d 996, 1004 (8th Cir. 2011)).  As the SRO found, "[t]he testimony adduced at the impartial hearing establishes that not only [D]istrict staff, but the parents' private evaluators, considered the student's most pressing deficits at the time of the 2007 CSE meeting to be his speech-language impairment and behaviors related to an attention deficit hyperactivity disorder[.]"  *Id.* 9.

As concerned the accrual of the claims for the 2007-08 school year, the SRO found that, according to the testimony, the Parents decided as early as May 2007 that the IEP formulated by

---

July 30, 2009.  When the District scheduled a follow up CSE meeting for early September 2009 to discuss the reports, the Parents indicated that they were unavailable on that day and failed to provide alternate dates as they had promised.  The SRO also noted that due to the Parents' insistence that District personnel observe B.W. only if accompanied by their private consultant, the observation took place very late in the school year and was unsatisfactory because B.W. was experiencing an "out of character day."  SRO Dec. 29-30.

the CSE did not offer their son a FAPE and their claim accrued no later than the end of June 2007.  *Id*. 8.  The due process complaint notice was served on the District on August 4, 2009, more than two years after their claims for the 2007-08 school year accrued and no exception to the limitations period applied.  *Id*.

    iv.  *Spoliation of E-mails*

The SRO upheld the IHO's determination that the District's practice prior to August 2009 of purging e-mails after six months did not amount to spoliation of evidence.  *Id*. 10-12.  While initially questioning whether the doctrine of spoliation developed in the context of civil litigation in state and federal courts applied to administrative proceedings such as an impartial hearing,[9] the SRO found that the Parents did not establish how they were prejudiced, and that the District had not purged the e-mails in bad faith.   He explained, in pertinent part:

> Even assuming for the sake of argument that spoliation disputes and the
> imposition of sanctions are the proper subject of a due process proceeding--a
> doubtful premise--in this case, the school psychologist testified that, as a matter
> of practice, she printed out all e-mail correspondence and put it in her file. . .
> [The District's director of technology] testified that the [D]istrict began archiving
> e-mails for a period of seven years in summer or fall 2009.  Prior to that time, e-
> mails had been automatically deleted after 180 days, such that e-mails prior to
> January 2009 were no longer retrievable.   Generally, once a party reasonably
> anticipates litigation, it must suspend its routine document retention/destruction
> policy and put in place a litigation hold to ensure the preservation of relevant
> documents.  I agree with the impartial hearing officer and hold that the [D]istrict's
> practice here does not reflect the kind of egregious conduct or bad faith necessary
> for a finding that the e-mails at issue were destroyed with a culpable state of
> mind, such that, if pending litigation were the only basis for finding that the
> [D]istrict had an obligation to preserve the e-mails, the parents' claim must fail.  I
> also agree with the impartial hearing officer that, given the system-wide deletion
> of e-mails from the [D]istrict's servers, not only would it be unwarranted to find

---

[9] "[T]he applicability of the cases cited by the parties to IDEA administrative proceedings is dubious, and I have serious reservations regarding whether there is a private right of action with regard to the alleged violations of the [New York State Records Retention] Schedule ED-1 in this case and, assuming with out [sic] deciding that there is a private right of action, whether an administrative hearing officer has the authority to hear such a claim or impose sanctions under the IDEA for spoliation of district records in general."  SRO Dec. 11.

that the [D]istrict deleted e-mails in bad faith, but also to find that the [D]istrict knowingly deleted any e-mails relating to the student. Additionally, I agree with the impartial hearing officer that it is left entirely unclear how further questioning of the [D]istrict's employees, even if they were to be shown to be conspiring to deprive the student of a [FAPE], would weigh in any way upon the IEPs and the programs the CSE actually offered to the student. This is not a case where the e-mails contain the only relevant information for the parents' claims that their child was denied a [FAPE].

SRO Dec. 11-12 (internal citations, quotations and footnotes omitted).

## III.  Discussion

### a.  Standard of Review

Upon an aggrieved party's appeal of the SRO's decision to the federal district court, the court must review the entirety of the administrative record in addition to supplemental evidence upon either party's request. 20 U.S.C. § 1415(i)(2)(c). Though IDEA appeals tend to come before the district court as motions for summary judgment, *see e.g. Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006), the existence of a genuine issue of material fact does not necessarily result in denial of the motion. *J.R. v. Bd. of Educ. of the City of Rye Sch. Dist.*, 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004). Rather, a motion for summary judgment in the IDEA context is more akin to an appeal from an administrative determination. *M.H.*, 685 F.3d at 226 (citing *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005)).

A district court reviewing a claim for private school tuition reimbursement under the IDEA must carry out either a two or three-step process. First, the court must ask "whether the state has complied with the procedures set forth in the IDEA." *Cerra*, 427 F.3d at 192. Second, the court must determine "whether the IEP developed through the Act's procedures '[is] reasonably calculated to enable the child to receive educational benefits,'" *Id.* (alteration in

original) (quoting *Walczak,* 142 F.3d at 129).  If these requirements are met, then the state has

complied with its obligations under the IDEA.  *Id.*  However, if these requirements are not met,

the court then asks "whether the private schooling obtained by the parents is appropriate to the

child's needs."  *Id.*

The rulings of the IHO and the SRO are subject to "independent" judicial review,

however, a federal court's role in reviewing state educational decisions under the IDEA is

"circumscribed," as the judiciary "generally lacks the specialized knowledge and experience

necessary to resolve persistent and difficult questions of educational policy." *Gagliardo*, 489

F.3d at 112 (citation and internal quotation marks omitted).  Upon independently reviewing the

administrative record, the court must make a determination based upon a preponderance of the

evidence, which "is by no means an invitation to the courts to substitute their own notions of

sound educational policy for those of the school authorities which they review." *Rowley*, 458

U.S. at 206.  Rather, the federal courts must accord "substantial deference" to such findings.

*Cerra*, 427 F.3d at 191.  Furthermore, district courts should abstain from making "subjective

credibility assessments."  *M.H.*, 685 F.3d at 240 (quoting *Grim v. Rhinebeck Cent. Sch. Dist.*,

346 F.3d 377, 383 (2d Cir. 2003)) (internal quotation marks omitted).

As the Second Circuit has recently articulated, the district court's analysis of the

administrative findings below must "hinge on the kinds of considerations that normally

determine whether any particular judgment is persuasive, for example whether it was based on

substantial greater familiarity with the evidence and the witnesses than the reviewing court."

*M.H.*, 685 F.3d at 244.  That being said, the court's conception of whether the administrative

findings are persuasive "must also be colored by an acute awareness of institutional competence

and role . . . [and] courts are required to remain conscious of these considerations in determining

the weight due any particular administrative finding." *Id.* District courts should afford more deference to administrative findings as to the substantive adequacy of an IEP, *id.* (citing *Cerra*, 427 F.3d at 195), and to any findings "grounded in thorough and logical reasoning," *id.*, than to determinations addressing whether an IEP was developed according to the proper methods. *Id.* District courts are also advised to show greater deference when "its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency." *Id.*

Finally, "[i]f the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision may be afforded diminished weight." *E.A.M. ex rel. E.M.,* 2012 WL 4571794, at *5 (citations and internal quotation marks omitted). Therefore, courts "defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer." *Id.* (citation and internal quotation marks omitted); *see also Matrejek v. Brewster Cent. Sch. Dist.,* 471 F. Supp. 2d 415, 426 (S.D.N.Y. 2007), *aff'd,* 293 F. App'x 20 (2d Cir. 2008) (deferring to the SRO's determination because doing otherwise would invite the court to substitute its "own uninformed judgment for the opinions of persons with far greater expertise without having any basis to do so . . . ."). However, when the district court correctly finds that the SRO's determinations are "insufficiently reasoned to merit that deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO," the court may "consider the IHO's analysis, which is also informed by greater educational expertise than that of judges, rather than [] rely[ing] exclusively on its own less informed judgment." *M.H.*, 685 F.3d at 246.

**b.  The Claims for the 2007-08 School Year are Time-Barred**

Under the IDEA, a claim accrues when the petitioner "knew or should have known about the alleged action that forms the basis of the complaint."  20 U.S.C. § 1415(f)(3)(C).  The Parents do not appear to dispute the findings of the IHO and SRO that their Impartial Hearing Demand, dated July 31, 2009, was filed more than two years beyond the time that their claim accrued for the 2007-08 school year.[10]  Rather, they argue that the two exceptions to the statute apply on the facts of this case:  (1) that the Parents were prevented from filing the due process complaint due to "specific misrepresentations by the local educational agency that it had resolved the problem forming the basis for the complaint;" and (2) that the local educational agency withheld information from the Parents that was required to be provided to them. 20 U.S.C. § 1415(f)(3)(D); N.Y. Educ. Law § 4404(1)(a).  The purported exceptions are premised on the fact that Dr. Finkelson failed to share with the CSE Dr. Cowan's diagnosis of PDD.  Pls.' Opp. Mem. 28-29.  As the SRO correctly found, even in the absence of any discussion of the diagnosis in the 2007-08 IEP, the Parents determined no later than June 2007 that the IEP did not provide B.W. with a FAPE.  SRO Dec. 9.  While the failure to apprise the CSE of the diagnosis may have contributed to the Parents' already formed conclusion of the inadequacy of the IEP, the record makes clear that the basis of their claim was already evident in June 2007.

The SRO also correctly determined that the second basis for exception—that the local educational agency withheld information from the Parents—is also inapplicable.  Here, the mother testified that she was made aware of the diagnosis in April 2006, and it was she that

---

[10] According to the SRO, the claim for the 2007-08 school year accrued no later than the end of June 2007. SRO Dec. 8.

brought it to the attention of the school psychologist.  SRO Dec. 10.  Thus, the exception does

not apply because the complained-of information was not withheld from the Parents.[11]

### c.  The 2008-09 and 2009-10 IEPs Are Substantively Adequate

As an initial matter, the central issue before the Court is whether the District's

recommended placements for the 2008-09 and 2009-10 school years were adequate to meet

B.W.'s educational needs—i.e., the substantive adequacy of the two IEPs.  Whether an IEP is

substantively adequate is undoubtedly a question of educational policy as to which this Court

must defer to the expertise of the SRO.  *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir.

2012) (citing *M.H.*, 685 F.3d at 244); *see also J.P. ex rel. D.P. v. N.Y.C. Dep't of Educ.*, 10 Civ.

3078 (ERK) (MDG), 2012 WL 359977, at *9, 13 (E.D.N.Y. Feb. 2, 2012).  Moreover, deference

to the SRO is particularly appropriate where, as here, the SRO conducted a thorough review of

the entire record before the IHO and has clearly explained the basis for his conclusions.

*Walczak,* 142 F.3d at 129; *W.S. ex rel. C.S. v. Rye City Sch. Dist.*, 454 F. Supp. 2d 134, 137

(S.D.N.Y. 2006).

An IEP is substantively adequate if it "provides personalized instruction with sufficient

support services to permit the child to benefit educationally from that instruction."  *D.D-S. v.*

*Southold Union Free Sch. Dist.*, 09 Civ. 5026 (JS) (WDW), 2011 WL 3919040, at *11

(E.D.N.Y. Sept. 2, 2011), *aff'd sub nom. D. D-S. v. Southold Union Free Sch. Dist.*, 11-4697,

2012 WL 6684585 (2d Cir. Dec. 26, 2012) (quoting *Rowley*, 458 U.S. at 203) (internal quotation

marks omitted).  The IEP must "be reasonably calculated to enable the child to receive

---

[11] The Court also finds that the IHO properly refused to consider Dr. Cowan's diagnosis because the issue was not
"reasonably referenced" in the Parents' Demand.  SRO Dec. 8; *W.M. v. Lakeland Cent. Sch. Dist.*, 783 F. Supp. 2d
497, 506 (S.D.N.Y. 2011).

educational benefits," *Gagliardo*, 489 F.3d at 107 (citation and internal quotation marks omitted), "likely to produce progress, not regression,'" and afford the student with an opportunity greater than mere "trivial advancement." *Cerra*, 427 F.3d at 195 (quoting *Walczak,* 142 F.3d at 130) (internal quotation marks omitted).  However, a school district is not required to provide "every special service necessary to maximize each handicapped child's potential," *Cerra,* 427 F.3d at 195 (citation and internal quotation marks omitted), or "everything that might be thought desirable by loving parents." *Walczak,* 142 F.3d at 132 (citation and internal quotation marks omitted).  Moreover, there is "a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers."  *Walczak,* 142 F.3d at 122 (citation and internal quotation marks omitted).

"Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." *Cerra,* 427 F.3d at 195.  "Deference is likewise appropriate where, as here, the district court's review is limited to the administrative record on which the SRO based his decision."  *P.K. ex rel. P.K. v. Bedford Cent. Sch. Dist.*, 569 F. Supp. 2d 371, 384 (S.D.N.Y. 2008).  Further, a court cannot choose between the competing views of experts on matters of educational policy or substitute its own judgment for that of the hearing officers which it reviews.  *Id.* (citing *Briggs v. Bd. of Educ. of Conn.,* 882 F.2d 688, 693 (2d Cir. 1989); *A.E. v. Westport Bd. of Educ.,* 463 F. Supp. 2d 208, 220 (D. Conn. 2006)).  When deciding whether a school district has met its obligations under the IDEA, a court "must examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan." *Cerra,* 427 F.3d at 195 (citation and internal quotation marks omitted).

i.     *The 2008-09 IEP*

The Parents challenge the substantive adequacy of the 2008-09 IEP on a number of grounds.  Initially, they attack a central premise of the District, that B.W. made substantial progress when he was enrolled at Osborn during his kindergarten year (2006-07), two years prior to the year in question.  They argue that his failure to make progress in kindergarten resulted at least in part from:  (1) the failure of Dr. Finkelson to advise B.W.'s teachers and other service providers of Dr. Cowan's diagnosis of PDD; (2) the refusal of the District to adopt the findings of Dr. Scalzo, one of the Parents' private evaluators, that B.W. required an intensive, multi-sensory (Orton-Gillingham) approach to teaching; and (3) the failure to take into account the reports of B.W.'s mother that he was being bullied and was otherwise having problems with socialization.  Pls.' Opp. Mem. 6-8.  These arguments are without merit.   First, as discussed above, even assuming that Dr. Finkelson failed to share the PDD diagnosis with the CSE, the Parents were certainly aware of the diagnosis and could have requested an impartial hearing at the time, or shared the information with the CSE themselves.  SRO Dec. 9.  More to the point in this context, Dr. Finkelson testified that irrespective of the diagnosis, the CSE properly addressed B.W.'s areas of unique need, and the SRO agreed.  Tr. 1707-13; SRO Dec. 9-10.  Indeed, the SRO found that even the Parents' private evaluators considered B.W.'s "most pressing deficits at the time of the 2007 CSE meeting to be his speech-language impairment and behaviors related to an attention deficit hyperactivity disorder[.]"  SRO Dec. 9 (citations omitted).

Second, while it is also true that the District did not provide B.W. with Orton-Gillingham instruction as recommended by Dr. Scalzo, the District was under no obligation to follow her recommendation.  The Court is not at liberty to favor Dr. Scalzo's opinion, a privately hired expert, over the deference that should appropriately be accorded to the District in matters of

educational policy.  *E.S. ex rel. B.S.*, 742 F. Supp. 2d at 436 ("The mere fact that a separately

hired expert has recommended different programming does nothing to change [the] ... deference

to the district and its trained educators" (quoting *Watson v. Kingston City Sch. Dist.*, 325 F.

Supp. 2d 141, 145 (N.D.N.Y. 2004), *aff'd*, 142 F. App'x 9, 10 (2d Cir. 2005)) (internal quotation

marks omitted).

 Finally, the hearing record and the SRO's decision effectively rebut the Parents' assertion

that B.W. did not progress in kindergarten.  The SRO found that the CSE recommended shared

aide services based in part on the perception that he had experienced a successful kindergarten

school year while receiving the services of an aide.  SRO Dec. 20.  The SRO found that the aide

provided B.W. with support during social interactions with peers.  *Id*.  More generally, when Ms.

Garrison, B.W.'s kindergarten teacher, was asked how she would describe B.W.'s progress in

her class, she testified "if I had to say in a word, I'd say great."  Tr. 5710-11.  As noted above,

Ms. Garrison testified that B.W. made significant progress that year, *id*. 5711, 5728, though he

sometimes became frustrated with new tasks and information.  Def.'s 56.1 ¶ 20; Tr. 3444.  In her

report on B.W.'s progress, Ms. Garrison rated him as "secure" (the highest rating) in fifty of the

fifty-two skills outlined in the report and between "developing" and "secure" for the remaining

two skills.  Pls.' 56.1 Resp. ¶ 21; D Ex. 39.  In the comments section of the Progress Report, Ms.

Garrison specifically wrote, "This has been a year of tremendous growth for [B.W.]-socially,

emotionally, and academically."  *Id*.  She explained that he had made friends, was able to write

words by sounding out, was using sight words when reading and writing, and his journal

reflected creative ideas.  She also noted that his math skills had steadily improved and he

understood all concepts that he had been taught.  *Id*.  Likewise, in comments on his pupil record

folder, Ms. Garrison specifically wrote that B.W. "made much progress through the year!"  D Ex. 72.

The Parents next allege that the June 19, 2008 CSE was improperly constituted because it failed to include a special education teacher who would be responsible for implementing the proposed IEP, and an "appropriate" regular education teacher.  Pls.' Opp. Mem. 9.  The record on appeal does not support the Parents' position.  The IEP specifically notes that the special education teacher who attended the June 19, 2008 CSE was Ms. Ranalli.  D Ex. 2 p. 5.  The SRO noted that Ms. Ranalli "had observed the student at his preschool program, conducted an educational assessment of the student in fall 2006, and attended his CPSE, section 504 and CSE meetings from the 2005-06 school year through the 2007-08 school year."  SRO Dec. 15 (citations omitted).  Moreover, the hearing record indicates, and the Parents acknowledge, that Ms. Ranalli could have been B.W.'s resource consultant teacher for the 2008-09 school year, and thus would have been responsible for implementing the IEP.  Pls.' Opp. Mem. 28; Def.'s Rep. Mem. 6.

The Parents object to the participation of Ms. Napoleon because they assert that she left the meeting early, had not observed B.W., and was not slated to be his regular education teacher.  Pls.' Opp. Mem. 10-11.  After review of the June 19 CSE meeting transcript, this Court concurs in the conclusion of both the IHO and the SRO that there is no evidence in the transcript to support the assertion that Ms. Napoleon left the meeting early.[12]  IHO Dec. 68; SRO Dec. 15.  The hearing record also indicates that Ms. Napoleon was a first grade teacher at the time of the

---

[12] To the extent that the SRO credited the testimony of the District's witnesses in this regard, this Court is in no position to contravene that finding.  In any event, as noted by the SRO, the conclusion comports with logic in that the Parents' attorneys were present at the meeting and would presumably have been heard to object to Ms. Napoleon absenting herself prematurely.  *See* SRO Dec. 15.

CSE and therefore could have been B.W.'s teacher if he had attended Osborn during the 2007-08

year.  Def.'s Rep. Mem. 6.  This is all the relevant regulations require.  *See* 34 C.F.R. Part 300,

App'x A, Question 26 ("The regular education teacher who serves as a member of a child's IEP

team should be a teacher who is, *or may be*, responsible for implementing a portion of the IEP . .

.") (emphasis added).  Moreover, even if she was not the appropriate person to have participated,

the SRO determined that such procedural violation would not have denied B.W. of a FAPE:

> The hearing record reflects that the student attended Windward during the
> 2007-08 school year, and the Windward CSE liaison, as well as the student's
> Windward science teacher, actively participated during the 2008 CSE meeting
> by providing specific, current information regarding the student['s] needs and
> skills.  I note that the district special education teacher who participated in the
> June 2008 CSE meeting had observed the student at his preschool program,
> conducted an educational assessment of the student in fall 2006, and attended
> his CPSE, section 504 and CSE meetings from the 2005-06 school year
> through the 2007-08 school year.  Additionally, the school psychologist who
> participated in the June 2008 CSE meeting had conducted a classroom
> observation of the student at Windward on June 9, 20008, and prepared an
> observation report that was reviewed by the June 2008 CSE.  The hearing
> record supports the impartial hearing officer's finding that the district, in
> formulating the student's June 19, 2008 IEP, 'reasonably relied upon the
> contributions of Windward and the [p]arents,' and does not show that these
> alleged procedural violations rose to the level of a denial of a FAPE.

SRO Dec. 15 (internal citations omitted).  Upon review of the record on appeal, this Court

discerns no basis for concluding otherwise.

Finally, the Parents challenge the 2008-09 IEP on the basis that the District had

"predetermined" the result prior to the June 19, 2008 meeting.  Pls.' Opp. Mem. 11-13.  Under

the IDEA, a school district may not finalize an IEP before the start of a CSE meeting.  34 C.F.R.

Part 300, App'x A, Question 32.  However, a school district is permitted to develop a draft IEP

prior to a CSE meeting "[s]o long as they do not deprive parents of the opportunity to

meaningfully participate in the IEP development process . . . ."  *M.M. ex rel. A.M. v. N.Y.C.*

*Dep't of Educ.*, 583 F. Supp. 2d 498, 506 (S.D.N.Y. 2008) ("Participation must be more than a

mere form; it must be *meaningful*" (quoting *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840,

858 (6th Cir. 2004)) (emphasis in original).  Thus, District evaluators can "prepare reports and

come with pre[-]formed opinions regarding the best course of action for the child as long as they

are willing to listen to the parents and parents have the opportunity to make objections and

suggestions." *M.M. ex rel. A.M*, 583 F. Supp. 2d at 506 (quoting *Nack ex rel. Nack v. Orange

City Sch. Dist.*, 454 F.3d 604, 611 (6th Cir. 2006)) (citations and internal quotations omitted); *id.*

(citing *W.S. v. Rye City Sch. Dist.*, 454 F. Supp. 2d 134, 147-48 (S.D.N.Y.2006) (equating draft

IEPs containing proposed placements with predetermination "will inevitably lead to

gamesmanship in the preparation of IEPs by CSEs, with the district withholding points of view

that ought to be out on the table and subject to discussion and parental challenge . . . prior to the

document's finalization.")).

      Upon review, the Court concurs with the finding of the SRO that "the parents' argument

is squarely contradicted by the evidence."  SRO Dec. 16.  As specifically detailed above, the

SRO found that the 2008-09 IEP was directly informed and appropriately modified by the input

of the Windward personnel.  For example:

- the 2008-09 IEP recommended that B.W. receive a general education program with daily 45-minute sessions of 15:1 resource consultant teacher services in a separate location, and the services of a full-time shared aide.  This represented an increase of the amount of weekly resource consultant teacher services previously offered in the 2007-08 school year, based in part upon input from the Windward liaison who agreed that the student should receive daily special education instruction.  SRO Dec. 20;

- the District speech-language pathologist testified that the description of the student's needs as reflected in proposed IEP present levels of performance section was accurate, and recommended that in addition to one individual and one group session of speech-language therapy per week, B.W. be offered one speech-language consultation per month.  SRO Dec. 22.  The District pathologist

reviewed proposed speech-language goals with the Windward CSE liaison during the June 2008 CSE meeting, *id.*, who approved of the proposed annual goals, which were then incorporated into the June 2008 IEP. *Id.*;

- to address the student's visual motor integration weaknesses, graphomotor deficits and sensory processing difficulties, the CSE recommended that he receive two group sessions of OT per week. *Id.*; D Ex. 2 p. 2. The record reflects that the District occupational therapist reviewed proposed annual OT goals with the Windward CSE liaison at the June 2008 CSE meeting, who offered comments regarding the student's skills and her approval of the goals. SRO Dec. 22; P Ex. E-1 p. 31-36; and

- the SRO noted that it was the Windward CSE liaison who stated during the meeting that the student would benefit from receiving extended school year (ESY) services because otherwise he would regress over the summer. SRO Dec. 22. The liaison specifically suggested that B.W. would benefit from a repetition and reinforcement throughout the summer at least three times a week so that he would retain all of the skills that he had learned. SRO Dec. 22. "In response to Windward's concerns, the June 2008 CSE offered the student three 60-minute sessions of resource room as ESY services, to address his reading/decoding skills." *Id.*

Further, while it is true that the District proposed goals to be included in the IEP, under the IDEA, it is not impermissible for school district personnel to prepare draft goals prior to the CSE meeting. *R.R. v. Scarsdale Union Free Sch. Dist.,* 615 F. Supp.2d 283, 294 (S.D.N.Y. 2009); *A.C. v. Board of Educ. Of the Chappaqua Central Sch. Dist.,* 2007 WL 1259145, at *4 (S.D.N.Y. Apr. 27, 2007).

   ii. *The 2009-10 IEP*

The Parents challenge the substantive adequacy of the 2009-10 IEP, generally alleging that the CSE relied on outdated evaluations of B.W., was comprised of teachers who had never met B.W., continued to ignore Dr. Cowan's PDD diagnosis, and failed to incorporate the evaluations of B.W. that were privately obtained by the Parents. As a result of the foregoing, the Parents allege that the IEP was not, and could not possibly be,

designed to meet B.W.'s unique needs.[13]

　　As an initial matter, the Court notes that the Parents' argument that the CSE failed to incorporate the evaluations of B.W. that were privately obtained by the Parents is particularly ironic given that the IHO found that the Parents had "furtively" obtained the private evaluations, purposely failed to provide them to the CSE, and provided them to the District only at the time that they commenced their litigation.  IHO Dec. 79-81, 87. Moreover, after finally receiving the private evaluations, the District promptly scheduled a CSE meeting for September 8, 2009—which would have been prior to the start of the 2009-10 school year—but the meeting was canceled at the request of the Parents.  The Parents then failed to reschedule the meeting as they had agreed to do.  Def.'s 56.1 ¶ 65.

　　The District was also unable to conduct a proper observation of B.W. at Windward in the Spring of 2009 because of the Parents' "stone-walling."  IHO Dec. 81. Both the IHO and the SRO found that in connection with private evaluations, the attempted observation of B.W. at Windward, and the deterioration of B.W. at Windward in the Spring of 2009, the Parents engaged in purposeful conduct to prevent the District from obtaining current information on B.W.  Thus, if, as the Parents assert, the proposed 2009-10 IEP was substantively deficient because it did not contain current information on B.W., it was precisely because the Parents kept that information from the District.  As the IHO aptly noted, "the IDEA does not contemplate any duty of the local educational authority to function with Nostradamus-like powers."  *Id.*

---

[13] However, as the SRO noted, the Parents have not appealed from the IHO's determination that, "based upon *what the District knew of the child at the time this IEP* was drafted, its goals were appropriate as were its educational modifications and provisions for sensory breaks, visual cues, prompts and manipulatives."  IHO Dec. 83 (emphasis in original); SRO Dec. 26.

Addressing the merits of the Parents' allegations, the Court concludes that the SRO correctly determined that the 2009-10 IEP was substantively adequate.  As noted above, "[b]ecause administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy, " *Cerra*, 427 F.3d at 195, and "is likewise appropriate where the district court's review is limited to the administrative record on which the SRO based his decision." *P.K. ex rel. P.K.*, 569 F. Supp. 2d at 384.  Here, the review of the record by the SRO as described above reflects that he carefully and thoroughly reviewed the information available to CSE on April 28, 2009.

The Parents then complain that in his decision, the SRO unduly relied on the testimony provided on behalf of the District and in his discussion of the adequacy of the April 2009 IEP, "there is no mention of any of Plaintiffs' expert testimony or evidence." Pls.' Opp. Mem. 13.  They then suggest that it is "highly questionable whether the SRO reviewed Plaintiff's exhibits at all." *Id.* 16.  There is no merit to this highly conjectural argument.  In the first instance, in describing how the 2009-10 IEP was drafted, the SRO was careful to note the input of the Windward teacher who participated, and who had current information concerning B.W.  For example:

- the Windward science teacher participated in the development of the 2009-10 annual goals related to the student's needs in the areas of attention, classroom transitions, reading decoding and fluency, spelling, written expression, mathematics, auditory comprehension, expressive and receptive language, pragmatic language and social skills, visual motor and graphomotor skills, and sensory processing abilities.  SRO Dec. 26;

- the special education teacher who attended the April 2009 CSE meeting, and who would have become the student's 2009-10 resource consultant teacher had he attended the public school, testified that the daily resource consultant teacher services set forth in the IEP were appropriate and had been developed based upon

the April 2009 Windward progress report and information provided by Windward personnel. *Id*. 27;

- based upon information that "appear[ed]" to stem from Windward personnel, modifications specific to the April 2009 IEP included providing examples of using manipulatives and graph paper, and providing pre-teaching and re-teaching opportunities. *Id*. 27. "Both the speech-language pathologist and the special education teacher who attended the April 2009 CSE meeting testified that, based upon the information before them, they agreed with the program modifications recommended for the student, which had been developed with the participation of the student's Windward science teacher." *Id*.

- "The school psychologist testified that the CSE changed the student's recommended weekly counseling service from individual to group based upon information from Windward that highlighted the student's difficulty cooperating with peers and developing social skills." *Id*.

- the District speech-language pathologist reviewed the proposed speech-language annual goals with Windward personnel during the April 2009 CSE meeting. *Id*. 28.

- "Regarding the student's OT needs, '[a]ccording to Windward, [the student], continue[d] to have difficulties with visual motor, sensory motor and graphomotor skills which affect his daily performance in the classroom and at home.'" *Id*. Accordingly, the CSE recommended two weekly sessions of OT to address these deficits. *Id*.

Is sum, the SRO concluded that "the hearing record reflects that the [D]istrict responded to the information available at the time the IEP was formulated and adjusted the student's special education and related service recommendations accordingly, frequently due to input from Windward personnel regarding the student's performance." *Id*. 28-29.

Secondly, even if the SRO gave greater weight to the District's experts, a court cannot choose between the competing views of experts on matters of educational policy or substitute its own judgment for that of the hearing officers which it reviews. *P.K. ex rel. P.K.,* 569 F. Supp. 2d at 384 (citing *Briggs*, 882 F.2d at 693); *A.E.*, 463 F. Supp. 2d at

220).  While the SRO came to a different conclusion than the IHO, this "does not mean that the SRO improperly ignored the IHO's determinations, or that the SRO's review was not thorough and careful."  *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 11 Civ. 00157 (LTS), 2011 WL 5130101, at *8 (S.D.N.Y. Oct. 28, 2011) (citing *R.R. v. Scarsdale Union Free Sch. Dist.,* 366 F. App'x 239, 242 (2d Cir. 2010) (rejecting the argument that the SRO ignored the IHO's findings where the record did not reveal any instance where the SRO did so, nor did appellants point to one)).  Accordingly, the Court will give appropriate deference to the SRO's careful and thorough decision.

### d.  The Purged E-mails Do Not Constitute Spoliation

Courts will only impose sanctions for spoliation where (1) "the party having control over the evidence had an obligation to preserve it at the time it was destroyed;" (2) "the records were destroyed with a 'culpable state of mind;'" and (3) "the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."  *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004).

There is no dispute that prior to August 2009, the District's practice was to purge 180 day old e-mails in the normal course of business.  This was the case with respect to every school, staff member and student within the District.  Tr. 5621.  Under a new archive system implemented in August 2009, e-mails began to be preserved for seven years.  *Id*. 5624.  However, as a result of the prior practice, the District had not preserved e-mails created on or before January 2009.

Plaintiff alleges that the District's practice was in contravention of their responsibility to retain a student's educational records.  The retention and disposition of school district records are generally governed by Schedule ED-1, 8 N.Y.C.R.R. §185.12, Appendix I ("ED-1").  Plaintiff is

42

challenging the decisions of the SRO and IHO, who held that the District's practice of purging e-mails did not rise to the level of spoliation of evidence.  SRO Dec. 10-12; IHO Dec. 58-64.

As a preliminary matter, the SRO reasonably questioned whether the case law on the subject of spoliation, which is based on the discovery rules contained in the Federal Rules of Civil Procedure or the CPLR, applied to IDEA administrative proceedings.[14]  SRO Dec. 11. Though he deemed it a "doubtful premise," he nevertheless assumed *arguendo* that spoliation disputes and the imposition of sanctions are the proper subject of an IDEA due process proceeding.  *Id*.  He determined that sanctions were not appropriate on the facts of the case in part because the school psychologist testified that, as a matter of practice, she printed out all e-mail correspondence and put it in her file.  *Id*.  Thus, the e-mails relevant to B.W. in her possession survived the District's retention practices.  The SRO also concurred with the IHO that the District's practice did not reflect the kind of egregious conduct or bad faith necessary for a finding that the e-mails at issue were destroyed with a culpable state of mind because practice was system-wide; thus, any finding that the District knowingly deleted any e-mails relating to B.W. would be unwarranted.  *Id*. 12.  In addition, they determined that the Plaintiffs had failed to establish how further questioning of the District's employees would weigh in any way upon the IEPs and the programs the CSE actually offered to the student, noting "[t]his is not a case where the e-mails contain the only relevant information for the parents' claims that their child was denied a FAPE."  *Id*. 12 (citation omitted).  Moreover, the Parents have not shown that the

---

[14] The SRO noted:  "I am especially wary of applying spoliation standards developed in the context of multimillion-dollar, multi-year litigation between national corporations with extensive resources to administrative proceedings under the IDEA, the regulations for which contemplate two days of hearing, contain no express discovery provisions, and generally require a decision to be rendered within a 45-day timeline."  SRO Dec. 11 n.13 (internal citations omitted).

purged e-mails were relevant to their claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *See* Pls.' Mem. 8-13; Pls.' Rep. Mem. 3-7.

## IV.  CONCLUSION

The Court finds that the preponderance of the evidence supports the SRO's well-reasoned conclusion that the 2008-09 and 2009-10 IEPs were reasonably calculated to enable B.W. to receive educational benefits as required by the IDEA and would allow B.W. to make educational progress, and not regress.  Having concluded that the District offered B.W. a FAPE for the two years in question, the Court need not reach Plaintiffs' claims regarding their unilateral placement of B.W. at Windward and Eagle Hill. *See T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 254 (2d Cir. 2009) (upon a finding that an IEP is procedurally and substantively adequate, the court need not evaluate the services provided by the parents); *Gavrity v. New Lebanon Cent. Sch. Dist.*, 05 Civ. 1024 (NAM) (DRH), 2009 WL 3164435, at *33 (N.D.N.Y. Sept. 29, 2009) (same).

Accordingly, Plaintiffs' Motion for Summary Judgment is DENIED and Defendant's Motion for Summary Judgment is GRANTED.  The Clerk of the Court is respectfully directed to terminate the motions (Docs. 11, 15) and to close this case.

SO ORDERED.

Dated:   March 29, 2013
         White Plains, New York

                                                            _____
                                                            Edgardo Ramos, U.S.D.J.